## MOBILE COUNTY *vs.* HAGAN ET AL.

[ACTION TO RECOVER RENT.]

1. *Lease, contract of ; construed.* -In a contract of lease for three years, from November 1, 1864, for $4,500 a year, payable quarterly, in such currency as the banks in Mobile usually received and paid out at the time, the lessee was authorized to put the property, much out of repair, into tenantable order, the cost of the repairs to be deducted from the rent as it fell due. On the 19th January, 1865, the lessors acknowledged, in writing, an account of $6,830 for the repairs to be "a credit, that is to say, so much paid on the rent of the building leased." The lease terminated by consent May 3, 1866,—*Held*, in a suit by the lessors to recover rent from May 1, 1865, to May 3, 1866, that the lessee was not indebted. The change of currency in the spring of 1865, from Confederate to U. S. treasury notes, could have no effect to reduce the claim for repairs previously estimated and credited on the rent.

APPEAL from the Circuit Court of Mobile.
Tried before Hon. JOHN ELLIOTT.

This was an action brought by the appellees against the appellant, to recover the sum of $4,462, alleged to be due from May 1st, 1865, to May 1st, 1866, for rent of a building in Mobile, which appellees, on the 19th of September, 1864, leased to appellant, for use as a court-house for a term of three years, commencing November 1st, 1864.

The contract of lease recites that the rent to be paid was payable quarterly; "that is to say, at the rate of four thousand five hundred dollars annually, and payable quarterly, and the said party of the second part doth agree to

use said premises in a tenant-like manner for the purpose aforesaid. And it is further agreed that if, at the end of said term, the county of Mobile shall need a further occupation of said building, for the purpose aforesaid, said party shall have the privilege to renew the said lease annually from year to year on the same terms, so often as necessity shall require, not to exceed ten years in all, from and after the first of November next, provided that two months, notice shall be previously given of each annual renewal, the said rents to be paid in such money and currency as shall be current at the times when respectively due—that is to say, in such currency, or money, as shall be at the time usually received and paid out by the banks in Mobile— and at the end of said occupation by the county of Mobile the said premises shall be yielded and surrendered, with all repairs and improvements, to the said parties of the first part, in the same order as received, reasonable use, wear and tear excepted."

The lease concludes as follows : "And it is further agreed between the parties, that inasmuch as said premises are now out of repairs, that the said parties of the second part shall, during the term of said lease, have power and authority to cause said building to be put in tenantable repair, so that it be made weather-proof and in good condition of safety, and that said repairs shall be such as shall be needed and practicable, and to a reasonable and proper extent, which is left to the discretion and good judgment of said county commissioners; and the said building in like manner shall be kept in repair during its occupation for the purpose aforesaid, all which repairs so to be made shall be made under the authority and order of said commissioners, and paid for by the county of Mobile, and the amount thereof shall be deducted from the rents accruing as they shall fall due, all which is agreed by said parties, so that said building be made tenantable and fit and safe for the use of the county as aforesaid."

On the 20th day of September, 1864, the day after the execution of the lease, the following stipulation was added

to the contract: "It is understood between the parties to the within lease, that in case of destruction of the property by fire or elements beyond the control of the parties, or by the public enemy, so that the same can not be used for the purposes of the county; in such case the lease and rent shall cease."

On the 19th day of January, A. D. 1865, George N. Stewart, (who was fully authorized,) in behalf of himself and other lessees, signed the following writing: "The account of repairs made on the building leased as above to the county of Mobile, has been this day rendered, amounting to the sum of six thousand eight hundred and thirty dollars, which sum is, therefore, a credit—that is to say, so much paid on the rent of the building above leased.

Mobile, January 19, 1865.

(Signed)　　　　　　　GEORGE N. STEWART,
　　　　　　　　　　For self and other owners."

This instrument was written by Stewart, at the request of the president of the commissioners court, upon presentation by the latter of the account for repairs, on a duplicate copy of the contract of lease. Stewart knew at the time that the repairs had been paid for in Confederate currency. The repairs were necessary, and made in pursuance of the contract, costing $6,830, which was paid by the county in Confederate money, that sum being a reasonable amount in that kind of currency. It was agreed at the time the lease was made that the necessary repairs were to be estimated and paid for in the currency in use at the time the repairs were made.

At the time the contract of lease was entered into, up to the 12th of April, 1865, the currency in use at Mobile, and which was received and paid out by the banks, was Confederate money, which was greatly depreciated. At the date of the repairs, and the execution of the receipt, $35 in Confederate money was required to purchase one dollar in gold.

On the 12th day of April, 1865, the United States troops

took possession of Mobile. Confederate money immediately became valueless, and thereafter the currency which was paid out and received by the banks in Mobile was United States Treasury notes, and National Bank notes, commonly called " green-backs."

It was admitted, subject to an objection to its relevancy, that the building and premises leased, in their condition as improved and repaired by defendant, could not have been rented out by plaintiffs, if they had had control of them, for a year from the 12th of April, 1865, for more than $1,500 or $2,000 in United States currency, and that in the condition in which the buildings were before the repairs, plaintiffs could not have rented them out from April 12th, 1865, to May 3d, 1866, for more than five hundred dollars.

At the time the building was sold, no mention was made of the rent here sued for, but shortly afterwards a claim therefor was presented to the commissioners' court, and by it disallowed.

The cause was submitted to the court, without the intervention of a jury, upon an agreed statement of facts, the substance of which has been given above. The court rendered judgment in favor of plaintiff for the amount sued for, and hence they appeal.

C. W. RAPIER, for appellant.—Now, by reverting to the situation of the parties at the date of the contract, to the condition of the country and the character of the currency at that time, and to other circumstances of the transaction, what are we to believe was meant by the stipulation in the contract, that the amount of repairs, when paid for by the county, should be deducted from the rents accruing as they should fall due? Is it not plain to every reasonable and unbiased mind that the cost of repairs made pursuant to the contract, and paid by the county in the currency in use at the time, was, by the understanding of the parties, to extinguish *pro tanto*, and dollar for dollar, the rents accruing? The language of the contract and all

the surroundings of the transaction point to this conclusion.

As to rules of construction see 2 Ala. 434; 19 Ala. 149; 22 Ala. 438; 39 Ala. 461.

To give to the contract the effect contended for by the appellees, we should have to sustain to the letter, that part of it which favors the lessors, and almost entirely ignore that part of it which favors the lessee. Or we should, on the basis of implication, have to engraft upon the contract complicated provisos and conditions, which would, to a great extent, destroy the force of the provisions for the deduction of repairs from the rents. This would not be in consonance with the recognized rules of interpretation. "The exposition," says Mr. Chief Justice Collier, "must be upon the whole instrument, *ex antecedentibus et consequentibus*, and according to the reasonable sense and construction of the words, and such exposition shall be made, if practicable, as will give efficiency to every clause."—2 Ala. 434.

It has been said by a learned judge, that "in expounding a contract, extraneous matter explanatory of it, may be resorted to."—2 Ala. 477. If so, then the receipt above set out, goes far to show the original understanding of the parties. It was given soon after the contract was entered into, and before any change of currency or of government had taken place. Both parties, at the time of the receipt, understood that the amount of repairs would extinguish or pay, *pro tanto*, the accruing rents. Nor is there room to suppose that any mistake or inadvertence in the receipt prejudicial to the lessors, could have taken place, or that any misapprehension, at that time, of the meaning of the contract, could have occurred, for the same eminent counsel who drew and signed the contract, also wrote and signed the receipt.

If any question be raised as to the validity of the contract, because Confederate money entered into the consideration of it, such question is answered by the decisions here referred to.—41 Ala. 423; *ib.* 548; 43 Ala. 547; 8 Wal. 1.

Mobile County v. Hagan et al.

The receipt or acknowledgment not only serves to illustrate the meaning of the contract, but it shows an acceptance of the amount of the repairs as payment, *pro tanto*, of the rents. There is no pretence of misrepresentation, or fraud, or mistake, in connection with the receipt. When such is the case, the acceptance of money or other thing in payment, is binding upon the party receiving it, and the receipt necessarily operates as an estoppel.—2 Porter, 280; 9 Porter, 150; 27 Ala. 254; 44 Ala. 242.

If the equities of this case are to be looked to, then the equities on the side of the lessee, as well as those on the side of the lessors, should be considered. It is apparent from the record that the building was greatly out of repair; that it was, in a manner, worthless for occupation without extensive repairs; that the rents agreed upon were high, because of the depreciation of the currency then in use; that the building, after the war, with the improvements which had been put upon it by the county, could not have been rented for a year, from the 12th of April, 1865, for more than $1,500 or $2,000, and without such improvements, for not more than $500 in U. S. currency; yet the lessors seek to recover, for that time, $4,500.

But the lessors can not recover, upon equitable considerations, independently of the contract. The third section of ordinance 26, adopted by the convention of 1865, (Revised Code, 59,) does not authorize any recovery, not justified by the contract. If it did, it would be void under section 10, article I, of the federal constitution. The section of the ordinance referred to, restricts the right of recovery to the contract. It provides, that the plaintiff may show what he is " legally, justly and equitably entitled to receive, *according to the contract.* "

In this case, the parties must stand or fall by the contract, however unwise or unprofitable, on one side or the other, it may have turned out to be.—*Kirtland v. Molton*, 41 Ala. p. 563.

GEORGE N. STEWART, *contra.*—The endeavor of appellants is to make the receipt, given on the 19th of January,

1865, play the part of a supplemental contract. But it is not a contract. It is but an acknowledgment or evidence of a pre-existing fact, which existed, and could be established as fully by evidence without the receipt as with it. It was but a convenient mode of evidence to establish what amount had been paid under the original contract in Confederate currency. The legal effect of that disbursement, made under the terms of the contract, was precisely the same before as after the receipt, the rights of the parties not being changed by it in any respect.

The test between receipts simply, and receipts which operate as contracts, is very clearly drawn by the law. To make a contract, or any agreement to vary a previous contract, which thereby becomes of itself a contract, there must be a new consideration; and clearly here there was no new consideration, and a past one will not be sufficient. As to the effect of the receipt, see *McKeagg v. Callahan,* 13 Ala. 828.

The case, then, beyond any doubt, stands upon the original contract, and the continued occupation under it, after the change of flag, and the terms of the contract cover the entire case.

The theory of the argument of the appellants, which is, that the adjustment of the amount expended for repairs, was a final settlement and disposal of that sum and transaction, can not be maintained. Rent paid in advance, never can be a final transaction from its very nature. The rights of the parties are not and can not be closed thereby. They must, notwithstanding such payment, be subject to such future events as may transpire, even where there is no stipulation as to the future.

In this very case, there is a stipulation that if the building be destroyed, the rent was to cease. Suppose that the building had been destroyed by fire on the next day after the receipt was given? What would become of the payment then? Must it not be refunded to the lessee? It is clear, then, that the payment was in confidence that the

rights of the parties continued as they were, and that future events might control the case.

So, if the title of the lessor failed, and there was an adverse recovery of the possession from the lessor by a stranger; or suppose the lessee purchased the property, as was actually the case here, would not the rent stop and a refunding of the rent be demandable?

In case of the necessity of such refunding, what would have been the measure of the refunding? If, in Confederate times, the same money would be proper. But suppose the refunding had not been paid till after the change of flag, when Confederate money was worthless, then the proper measure would be the *value* of the currency when received. That would be justice.

The true position of the lessor who receives rent in advance, is that of a trustee, to apply the rent as it falls due, and if not, to return the fund received to the lessee, if the duty to pay rent ceases. The fund provided in advance in this case was proper and sufficient to pay rent in Confederate times, but not to pay the rent as the contract required after the change of flag.

The idea of *acceptance* of that kind of money does not hold here. There was no money paid to the lessee. The contract authorized the county to make repairs at their discretion. They did so, to an excessive amount, and this they paid for in paper of very little value. They made these repairs and payments as their own act. As Confederate money was in circulation then and none other, the implication was that such payments were proper, and that was acceded to. The prices, of course, if measured in "dollars," were most exorbitant, but it was not at all in contemplation that the rent would continue to be payable in the same currency. But the terms of the lease were not overruled by this implication. The parties had expressly stipulated for the case of a change in the currency, and each party was, by express contract, to take the chances of profit or loss, arising out of any change, and the lessors are properly entitled to what they expressly stipulated for.

They had to run the risk of a further depreciation of the value of the currency, if the Confederacy had continued without return to specie payment during the four or *ten* years of the lease, and, consequently, are entitled to the benefits of the change.

Under the claim made, if the lessees had expended the whole amount of the four years rent in depreciated currency, they would wholly overrule and annul an important and controlling part of the contract, which they can not do by their own act.

The receipt was conclusive in one respect. It was an assent to the enormous amount of what is called repairs. The construction should be strict in this respect, and as the payment was the act of the lessee and not made to the lessor, the right of the lessor should not be destroyed by implication.

It is very clear that the lessors and lessees, both, by their contract, intended to exclude all idea of speculation on the rise or fall of money. They provided expressly that the rent should be paid in bankable currency at the expiration of each quarter. Yet here the appellants claim the right of the lessee to gain a great advantage, not stipulated for, by a speculation on the value of the currency, and this by their own act. This principle of speculation on the value of the currency was excluded carefully by the terms of the contract, by stipulation as to the kind of money due at each quarter, and this principle is now sought to be avoided.

Suppose the contract had provided that Confederate money should be paid during the whole term for rent? Would the court enforce such a contract after the change of flag? It is presumed not, yet here this kind of payment is sought to be enforced by construction against the express terms of the contract.

The only issue between the parties in the court below was whether the rent, after the change of flag, was paid or not.

There is in the record evidence, offered by appellant, to

disparage the value of the property. The proof of value was the price agreed to be paid, let the currency be what it might, even gold. Of course, the county would not have agreed to give such price, if the value was so small as pretended.

The case stands on the contract, and the issue is payment *vel non.*

The question can be illustrated thus: Suppose, instead of repairs, the lessees had deposited in the hands of a third person, as a trustee, the sum of $6,830, in Confederate money, for the purpose of paying the rent quarterly, if the building was not destroyed by fire, as it should fall due, and if no rent did accrue, then to return the money to the lessee. It is clear that the trustee would pay the rent as it fell due, in Confederate currency, but when, by the contract, it fell due in green-backs, he could not do so.

Now, what can be the difference between that case and the case before the court ? No distinction in principle can be drawn. The fund remained in abeyance as a trust fund to be paid to the lessor if rent accrued, or to the lessee if no rent ever became due, which was contingent, and depended on the happening of subsequent events, recollecting, always, that the receipt had no operation as a *contract* to change the terms of the original lease.

B. F. SAFFOLD, J.—This case is confused by events which occurred subsequently to the transactions between the parties. If we construe the contract and the writing of January 19, 1865, together, without reference to what transpired afterwards, and apart from the parol evidence, the following propositions are clearly deduced : 1st. The repairs were to be made as speedily as practicable, in order to render the building tenantable, for the purpose designed ; and they were to be considerable, costing much more than the rent accrued at the time of their completion. 2d. This cost was not to be a collectible demand against the lessors, but a payment of the rent for the time necessary to absorb it. 3d. The value of the repairs was estimated, agreed

to, and paid on the rent, on the 19th of January, 1865, by the express assent, and concurrence of both parties.

This view of the case is strengthened by the parol evidence, that the building could not have been rented, from the 12th of April, 1865, to the 3d of May, 1866, for more than $500 in lawful money, in the condition it was at the date of the renting. It is not changed by the provisions of the contract for the payment of the rent quarterly, in the currency in use at the time. Because the lease was for three years, the repairs consumed only about half of it, the compensation being sufficient, under the existing circumstances, ample scope was left for the operation of the provision respecting any change in the currency.

The appellees, in effect, treat the cost of the repairs as an independent claim of the lessee, to be used as an offset. This is not so. It was the manner of the payment of the first rent, so expressed by the contract, and so admitted in the writing.

Ordinance 26, § 3 of 1865, Revised Code, p. 58, is not applicable to this case. Here is not a contract agreed to be discharged by payment in Confederate currency. The obligation of lessee was to pay in repairs, and in currency bankable at the maturity of each installment, whether gold or something else. The value of the repairs was ascertained, consented to, and credited on the rent, by the lessors themselves, or, as they expressed it, " which sum is, therefore, a credit—that is to say, so much paid on the rent of the building above leased."

If the Confederate currency had remained in circulation until the 3d of May, 1866, when the property was sold, the lessors would not have received any money. Why should the fact that, for the greater portion of the time, they became entitled to receive a much more valuable currency, diminish the right which the lessee had previously acquired against them?

The stipulation respecting the cessation of rent, if the building should be destroyed, was a concession in favor of the lessee, to become operative only in the contingency

provided for. It was a condition added to the contract the next day, and can not be presumed to indicate the intention of the parties further than is directly expressed in it.

The judgment is reversed and the cause remanded.